UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YVONNE EVANS and WILLIAM EVANS,<br><br>Plaintiffs,<br><br>v.<br><br>NEVADA COUNTY SHERIFF'S DEPARTMENT, a public entity, KEITH ROYAL, an individual, and DOES 1 through 20, inclusive,<br><br>Defendants. | No.  2:13-cv-01775-TLN-DAD<br><br><br>**ORDER** |

This matter is before the Court on Defendants Nevada County ("the County") and Keith Royal's ("Royal") (collectively "Defendants") motion to dismiss.  (ECF No. 14.)  Plaintiffs Yvonne Evans ("Yvonne") and William Evans ("William") (collectively "Plaintiffs") oppose Defendants' motion.  (ECF No. 15.)  For the following reasons, Defendants' motion is DENIED IN PART and GRANTED IN PART.

**I.      FACTUAL BACKGROUND**

Yvonne began working for the Nevada County Sheriff's Department as a senior accounting assistant in 2004.  (ECF No. 12 at ¶ 1.)  Yvonne's duties in this position included depositing inmates' money in the Inmates' Welfare Fund bank account,  delivering criminal

1

defendants' home detention funds to the county treasury, and keeping records of these transactions. (ECF No. 12 at ¶ 11.) Yvonne's responsibilities were audited yearly and her job performance reviews were generally good. (ECF No. 12 at ¶ 12.) Yvonne worked from the jail and was supervised by William Evans until February 2009. (ECF No. 12 at ¶ 17.)

During the majority of her employment, Yvonne was married to Keith Cantrell ("Cantrell"), but the two separated sometime in the fall of 2008. (ECF No. 12 at ¶ 13.) Their relationship had been violent and Cantrell was convicted of misdemeanor spousal abuse prior to the end of their marriage. (ECF No. 12 at ¶ 13.)

In December of 2008, Yvonne alleges that Undersheriff Richard Kimball ("Kimball") embraced her and "planted a lingering kiss on her forehead" while Yvonne was in Kimball's office. (ECF No. 12 at ¶ 14.) Yvonne claims to have rebuffed this action. (ECF No. 12 at ¶ 14.) Following the events in Kimball's office, Yvonne states that she learned from other employees in January 2009, that Kimball was conducting an investigation into her personal life, which Yvonne believes was because Kimball was sexually obsessed with her. (ECF No. 12 at ¶ 15.) Yvonne complained to her union steward about this investigation. (ECF No. 12 at ¶ 16.) The union steward allegedly spoke to Kimball about the matter, and Kimball denied the allegation to Yvonne. (ECF No. 12 at ¶ 16.)

In February 2009, Yvonne received notice that she was being involuntarily transferred to Sheriff's Administration. (ECF No. 12 at ¶ 17.) Plaintiffs allege that William, as Yvonne's supervisor, was asked to downgrade Yvonne's annual appraisal to justify Yvonne's transfer. (ECF No. 12 at ¶ 17.) Yvonne claims that at her new office, Kimball would walk past her desk, run into her in the hallways, and leer down her blouse while she sat at her desk. (ECF No. 12 at ¶ 18.)

Plaintiffs allege that somehow in early 2009, Cantrell discovered that Kimball had kissed Yvonne. (ECF No. 12 at ¶ 19.) This allegedly drove Cantrell into a jealous rage, and he left a message on Yvonne's mother's phone threatening to report Yvonne for embezzling county funds. (ECF No. 12 at ¶ 19.) Yvonne claims she turned the voicemail over to the Sheriff's Department but no action was taken. (ECF No. 12 at ¶ 19.) Also at some point in 2009, Yvonne

2

1    and William began a personal relationship which they reported to human resources in the fall.

2    (ECF No. 12 at ¶ 20.)  Yvonne alleges that Kimball's harassment continued.  (ECF No. 12 at ¶

3    21.)

4           William and Yvonne married on August 12, 2010.  (ECF No. 12 at ¶ 22.)

5    Plaintiffs allege Cantrell threatened again to disclose that Yvonne was stealing money from the

6    county on September 7, 2010.  (ECF No. 12 at ¶ 22.)  Yvonne alleges she told Kimball about this

7    threat and he told her not to worry.  (ECF No. 12 at ¶ 22.)

8           On September 10, 2010, the Sheriff's Department placed Yvonne on

9    administrative leave relating to Cantrell's allegations.  (ECF No. 12 at ¶ 23.)  William alleges

10   that, following Yvonne's suspension, others at the Sheriff's Department suggested to William that

11   Yvonne should confess.  (ECF No. 12 at ¶ 23.)  Plaintiffs retained a criminal lawyer at this time.

12   (ECF No. 12 at ¶ 23.)  Yvonne alleges that she first learned that money was missing during

13   questioning.  (ECF No. 12 at ¶ 24.)  Around $13,000 disappeared, some of which Plaintiffs claim

14   went missing while Yvonne was on medical leave.  (ECF No. 12 at ¶ 41.)

15          Shortly after Yvonne's suspension, William was in the Sheriff's Department's

16   substation in Truckee when he allegedly heard from another employee that bail money in a sealed

17   envelope had been stolen en-route to Nevada City.  (EFC No. 12 at ¶ 25.)  William alleges that,

18   when he returned to Truckee several weeks later, he was informed that the employee who

19   discovered the missing money was pressured by Kimball to accept responsibility for the loss and

20   receive a reprimand.  (ECF No. 12 at ¶ 25.)  William later presented this information in written

21   form at Yvonne's Skelly hearing.[1]  (ECF No. 12 at ¶ 49.2)[2]

22          Sheriff's Department detectives interrogated Yvonne in November, 2010.  (ECF

23   No. 12 at ¶ 24.)  Yvonne alleges there was some confusion and that she believed the detectives

24   were only interested in the period of time when she lived with Cantrell, and therefore her answers

25

26   [1] A Skelly hearing derives its name from *Skelly v. State Personnel Board*, 15 Cal. 3.d 194 (1975).  Dr. Skelly, a
     public employee, was terminated from his employment with the State of California.  The California Supreme Court
     determined, among other things, that he was deprived of his due process right to pre-disciplinary discovery.  A Skelly

27   hearing allows an employee to respond to the allegations prior to the imposition of any actual disciplinary action.
     [2] Plaintiff's complaint has two paragraphs numbered 49 on the same page.  The Court has designated the first as 49.1

28   and the second as 49.2.

1    about taking home money were incomplete.  (ECF No. 12 at ¶ 24.)  Yvonne believes that Kimball

2    used this discrepancy to justify his investigation of Yvonne in retaliation for her complaints about

3    sexual harassment.  (ECF No. 12 at ¶ 24.)

4             Plaintiffs allege that in December, 2010, the assistant district attorney of Nevada

5    County told Yvonne's criminal attorney that he was under enormous pressure from the Sheriff's

6    Department to issue a warrant for Yvonne's arrest.  (ECF No. 12 at ¶ 26.)  Near the end of 2010,

7    Yvonne spoke to her union representative, who she alleges advised her not to file a formal

8    complaint for harassment or retaliation and to instead focus on saving her job.  (ECF No. 12 at ¶

9    27.)

10            On February 3, 2011, Plaintiffs claim Kimball sent a letter to Yvonne informing

11   her that he was recommending her dismissal.  (ECF No. 12 at ¶ 28.)  After receiving this letter,

12   Yvonne filed a formal complaint with human resources for workplace harassment and retaliation.

13   (ECF No. 12 at ¶ 30.)  On February 24, 2011, the Nevada County director of human resources

14   sent a letter to Yvonne acknowledging the receipt of Yvonne's complaint and informing Yvonne

15   that an outside investigator, Susan Schoenig ("Schoenig") had been appointed to conduct an

16   investigation into the matter.  (ECF No. 12 at ¶ 30.)

17            Schoenig issued her report on April 26, 2011.  (ECF No. 12 at ¶ 33.)  While her

18   report found that Kimball did embrace and kiss Yvonne, Schoenig found that Yvonne's other

19   allegations were either unsupported or insufficiently supported by corroborating evidence.  (ECF

20   No. 12 at ¶¶ 35–37.)  A parallel internal investigation by the Nevada County Sheriff's

21   Department found that Kimball was having an affair with another member of the Sheriff's

22   Department.  (ECF No. 12 at ¶¶ 38–40.)  Kimball resigned not long after, and Plaintiffs allege

23   that his resignation was an attempt to cover up the affair, which Plaintiffs believe would bolster

24   Yvonne's claims of retaliation and sexual harassment.  (ECF No. 12 at ¶ 40.)  Plaintiffs believe

25   the independent investigation was inadequate and relied on faulty evidence.  (ECF No. 12 at ¶¶

26   40–43.)

27            Plaintiffs allege that, after Kimball left, Royal moved forward with an

28   investigation of Yvonne in retaliation for her complaints against Kimball.  (ECF No. 12 at ¶ 44.)

4

1    Plaintiffs contend that Royal did this because he was upset that Kimball had been forced to resign

2    because of Yvonne's claims.  (ECF No. 12 at ¶ 44.)  Royal approved Yvonne's termination

3    effective May 23, 2011.  (ECF No. 12 at ¶ 44.)  Plaintiffs allege that Royal opposed Yvonne's

4    unemployment benefits application on the grounds that she had stolen money.  (ECF No. 12 at ¶

5    45.)  A judge later reversed Yvonne's denial of unemployment benefits.  (ECF No. 12 at ¶ 47.)

6          Plaintiffs further allege that Royal bullied the district attorney to charge Yvonne

7    with embezzlement, finally convincing the district attorney to file a criminal complaint against

8    Yvonne, charging her with four misdemeanor counts of failing to timely deposit county funds.

9    (ECF No. 12 at ¶ 46.)  Yvonne was arraigned on August 8, 2011.  (ECF No. 14-1 at 6.)  She was

10   later arrested, booked on August 24, 2011 (ECF No. 15 at 7), and fingerprinted before the charges

11   were dismissed as outside the statute of limitations.  (ECF No. 12 at ¶46.)  The local media

12   reported on Yvonne's arrest and charges.  (ECF No. 12 at ¶ 46.)

13         Plaintiffs allege that Royal continued his retaliation against Yvonne by also

14   retaliating against William.  (ECF No. 12 at ¶ 49.1.)  William contends that Kimball, Royal, and

15   others within the Sheriff's Department made numerous actions and comments to William in an

16   attempt to force William to resign.  (ECF No. 12 at ¶ 49.2.)  In August, 2011, William was placed

17   on administrative leave pending clearance by a psychiatrist.  (ECF No. 12 at ¶ 49.2.)  William

18   claims that Royal had the psychiatrist diagnose William as "not a team player" to prevent him

19   from finding work with another law enforcement agency.  (ECF No. 12 at ¶ 50.)  Plaintiffs allege

20   William's health suffered ill effects as a result of this treatment resulting in William filing

21   retirement papers in October, 2011.  (ECF No. 12 at ¶ 50.)

22   **II.    PROCEDURAL HISTORY**

23         Plaintiffs' complaint was originally filed on August 24, 2013.  (ECF No. 1.)

24   Subsequently, Plaintiffs filed their first amended complaint ("FAC") with this Court on May 5,

25   2014.  (ECF No. 12.)  Plaintiffs allege violations of their First and Fourth Amendment rights, as

26   well as a violation of California's Fair Employment and Housing Act ("FEHA") for retaliation

27   against a sexual harassment complaint.  (ECF No. 12.)  Defendants moved to dismiss counts one

28   and two of Plaintiffs' FAC on May 22, 2014.  (ECF No. 14.)  Plaintiffs filed an opposition to

1    Defendants' motion on June 19, 2014.  (ECF No. 15.)  Defendants replied on June 26, 2014.

2    (ECF No. 17.)

3        **III.    LEGAL STANDARD**

4            Federal Rule of Civil Procedure 8(a) requires that a pleading contain "a short and

5    plain statement of the claim showing that the pleader is entitled to relief."  On a motion to

6    dismiss, the Court assumes all factual allegations are true.  *Cruz v. Beto*, 405 U.S. 319, 322

7    (1972).  A court is bound to give plaintiff the benefit of every reasonable inference that can be

8    drawn from the well-pleaded allegations of the complaint.  *Retail Clerks Int'l Ass'n v.*

9    *Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  While a plaintiff need not allege "'specific facts'

10   beyond those necessary to state his claim and the grounds showing entitlement to relief," *Bell*

11   *Atlantic v. Twombly*, 550 U.S. 544, 570 (2007) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S.

12   506, 508), "a claim has facial plausibility when the pleaded factual content allows the court to

13   draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

14   *Iqbal*, 556 U.S. 662, 678–79 (2009) (*citing Twombly*, 550 U.S. at 556).

15           Nevertheless, a court "need not assume the truth of legal conclusions cast in the

16   form of factual allegations." *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th

17   Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than

18   an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.  A

19   pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

20   elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678

21   ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

22   statements, do not suffice.")  Additionally, it is inappropriate to assume that the plaintiff "can

23   prove facts that it has not alleged or that the defendants have violated the … laws in ways that

24   have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of*

25   *Carpenters*, 459 U.S. 519, 526 (1983).

26           Ultimately, a court may not dismiss a complaint in which the plaintiff has alleged "enough

27   facts to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting

28   *Twombly*, 550 U.S. at 570).  While the plausibility requirement is not akin to a probability

requirement, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.  This plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### IV.   ANALYSIS

Plaintiffs' FAC presents three causes of action against Defendants based on several different incidents.  Defendants do not address Plaintiffs' claims under FEHA in either their motion to dismiss (ECF No. 14) or their reply brief to Plaintiffs' opposition.  (ECF No. 17.) The Court will therefore not address Plaintiffs' claims under FEHA in its analysis.

Regarding Plaintiffs' remaining claims, Yvonne has alleged First and Fourth Amendment claims against both Defendants, and William has alleged First Amendment claims against both Defendants.  The Court will first address Plaintiffs' claims against the County, and will then address Plaintiffs' individual claims against Royal.

### a.  Plaintiffs' First Amendment Claims Against the County

Yvonne and William both allege First Amendment claims against the County contending that Royal's actions constitute the official policy of the County.  (ECF No. 12 at ¶ 57.) Defendants argue that Plaintiffs failed to allege a County policy or custom responsible for Plaintiffs' injuries.  (ECF No. 14-1 at 7.)  The Court agrees with Defendants and finds that Plaintiffs have not pled a policy or custom for which the County is liable.

Under 42 U.S.C. § 1983, a municipality may not be held liable for the actions of its employees unless those actions constitute a government policy or custom.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–95 (1978).  Plaintiffs "must predicate [their] recovery on some particular action taken by the city, as opposed to an action taken unilaterally by a nonpolicymaking municipal employee."  *Oklahoma City v. Tuttle*, 471 U.S. 808, 829 (1985); s*ee also Davis v. City of Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989) ("A plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident of unconstitutional action by a non-policymaking employee.")

Aside from claiming that Royal is "the final policy making authority, for the Sheriff's Department, with power to hire and fire employees," Plaintiffs offer no other allegations

1    of policy or custom to support county liability.  (ECF No. 15 at 13.)  Plaintiffs argue "several 9th

2    Circuit cases have held that a county sheriif[sic] under California law if[sic] a final decision

3    making authority, whose actions can satisfy the requirements of Monell," and offer three cases,

4    one of which is from the Seventh Circuit.  (ECF No. 15 at 13–14.)  Plaintiffs mischaracterize the

5    holdings of these cases.

6              The case law cited by Plaintiffs concerns whether a sheriff, who for purposes of

7    the analysis is assumed to be a policymaker, would be considered a policymaker for a county

8    versus a policymaker for the state.  *See e.g.*, *Brewster v. Shasta County*, 275 F. 3d 803, 807 (9th

9    Cir. 2003) (finding that the sheriff acts for the county, not the state, when investigating a crime);

10   *Streit v. Cnty. of Los Angeles*, 236 F.3d 552, 561 (9th Cir. 2001) (finding that sheriffs were not

11   listed in the California Constitution as part of the "state executive department" and were therefore

12   agents of the counties instead of the state); *Nelson v. County of Sacramento*, 926 F. Supp. 2d

13   1159, 1168 (E.D. Cal. 2013) (finding that sheriffs are agents of the county, not the state); *Cortez*

14   *v. Cnty. of Los Angeles*, 294 F.3d 1186, 1187 (9th Cir. 2002) (holding the sheriff is a policy-

15   maker for the county, not the state.)  These cases do not discuss in what instances a sheriff is in

16   fact a policymaker and when he or she is not.

17             Plaintiffs argue that Royal's actions against Plaintiffs became the policy of the

18   County based on Royal's discretion to hire and fire employees for the Sheriff's Department.

19   (ECF No. 15 at 13.)  While this demonstrates that Royal was an authority figure in the

20   department, it is not enough on its own to hold the County liable for his employment-related

21   decisions.  In *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), the Supreme Court found that

22   proving a policy-making official has discretion to make certain decisions is not enough to

23   demonstrate municipal liability.  *Id.* at 481–82.  Instead, the court found that "[t]he official must

24   also be responsible for establishing final government policy respecting such activity before the

25   municipality can be held liable."  *Id.* at 482–83.  As the Court explained:

26

27              Thus, for example, the County Sheriff may have discretion to hire and fire employees
             without also being the county official responsible for establishing county employment
28           policy.  If this were the case, the Sheriff's decisions respecting employment would not

give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.

*Id.* at 484 n.12. The Court found that, only if the Board in the example delegated final authority to set final employment policy to the sheriff could the municipality be held liable for the sheriff's decisions on hiring and firing employees. *Id.*

Plaintiffs have not alleged facts demonstrating that Royal was delegated such authority. As *Pembaur* makes clear, simply having the discretion to hire or fire is not enough to prove an official is the final policymaker for that particular issue. *See id.* Therefore, the County's motion to dismiss Plaintiffs' First Amendment retaliation claims against the County is GRANTED.

### b. Yvonne's Fourth Amendment Claim Against the County

Yvonne alleges a Fourth Amendment claim against the County based on the argument that Royal's actions constitute County policy. (ECF No. 12 at ¶ 66.) For the same reasons as discussed above, the Court finds Plaintiffs have not alleged facts supporting the existence of a policy. Therefore, the Court finds that Yvonne's Fourth Amendment claim fails.

Again Yvonne argues that a sheriff may be a final policymaker regarding law enforcement decisions. (*See* ECF No. 15 at 14 (*citing Brewster*, 275 F. 3d at 812 (finding that the sheriff is a final policymaker when investigating crime within the county)).) However, even an action by a final policymaker is not enough, on its own, to subject the County to liability for Royal's actions. *See Pembaur*, 475 U.S. at 483. Instead, the single act needs to be clearly intended to set a policy. *Id.* Yvonne has not alleged Royal's actions were consciously chosen in order to pursue a particular policy, and it is not clear what Yvonne alleges that policy might be. *See Oklahoma City*, 471 U.S. at 823. The Court therefore GRANTS the County's motion to dismiss Yvonne's Fourth Amendment claim against the County.

### c.  Yvonne's First Amendment Retaliation Claim Against Royal

Yvonne claims Royal retaliated against her for exercising her First Amendment rights by filing a report for sexual harassment against Kimball.  (ECF No. 12 at ¶ 55–56.)  Royal has moved to dismiss this claim on the grounds that Yvonne's speech was not protected by the First Amendment or, in the alternative, that Royal is entitled to qualified immunity.  (ECF No. 14-1 at 12–14.)  As the Court does not find Yvonne's speech protected by the First Amendment, it declines to address Royal's claim for qualified immunity.

In order to prove retaliation for First Amendment speech, Yvonne must first prove that her speech was protected by the First Amendment.  *McKinley v. City of Eloy*, 705 F.2d 1110, 1113 (1983).  The Supreme Court has recognized that the State has a different interest in regulating the speech of its employees than it does regulating the speech of ordinary citizens.  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  When the government acts as an employer, it has an interest in promoting efficiency of public services.  *Connick v. Myers*, 461 U.S. 138, 142 (1983).  At the same time, "[i]t is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'"  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (*citing Pickering*, 391 U.S. at 568).  Therefore, the ability of the State to regulate public employees' speech strikes a balance between "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Pickering*, 391 U.S. at 568.

The test for determining whether a public employee's speech is covered by the First Amendment is: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or a public employee; and (3) whether the state had an adequate justification for treating the employee differently than other members of the general public.  *Eng*, 552 F.3d at 1070.  To reach the other factors, a plaintiff must first show that the statements substantially involve a matter of public concern.  *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.  Speech that deals with individual personnel disputes and grievances is considered outside public concern because it does not provide information members of society need to make informed decisions about the operation of government.  *McKinley*, 705 F.2d at 1114.  The Ninth Circuit has found a number of serious personnel-related issues to be matters of public concern, including "sexual abuse of public employees while on the job." *Gibson v. Office of Atty. Gen.*, 561 F.3d 920, 925–26 (2009).  However, "[a]n employee's complaints about her *own* job treatment are emblematic of the type of personnel matters that the Ninth Circuit has deemed unprotected under the public concern test." *Trizuto v. Bellevue Police Dept.*, 983 F. Supp. 2d 1277, 1288 (W.D. Wash. 2013) (*citing Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004).  "Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006) (quoting *Connick*, 461 U.S. at 154).

In *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), the plaintiff was a correctional officer who complained that the prisoners were sexually harassing many of the female officers and that the prison administration did not take action. *Id.* at 533–36.  Freitag filed internal complaints, and also sent letters to her state senator and the Inspector General. *Id.* at 535.  The Ninth Circuit found that, while Freitag's complaints to her state senator and the Inspector General about her supervisor's failure to do anything about prisoners sexually harassing Freitag and other female correctional officers was of public concern, Freitag's internal reports about the situation, however, were not protected speech because they were internal employment matters. *Id.* at 545–46.

Yvonne filed her sexual harassment complaint with human resources and did not direct her complaints outside the usual chain of command for handling these types of complaints. (ECF No. 12 at ¶ 30.)  While information about sexual harassment of public employees is of interest to the public, the Ninth Circuit has found that reports of sexual harassment brought

1   internally are not constitutional matters of public concern. *See Freitag*, 468 F.3d at 546; *Luox v.*

2   *Maire*, 337 Fed. Appx. 695, 698 (2009) (finding that plaintiff's internal, confidential sexual

3   harassment complaint was not a matter of public concern); *Conklin v. City of Reno*, 433 Fed.

4   Appx. 528, 530 (2011) (finding that plaintiff's "war stories" about harassment that happened ten

5   years previous had only minimal value to the public, and were directed at entertaining plaintiff's

6   audience, not informing the public); *Trizuto*, 983 F. Supp.2d at 1288 (finding that, as plaintiff had

7   only told two superior officers and an internal investigation about her allegations, and had asked

8   the officers not to tell anyone, plaintiff's complaints were not a matter of public concern).

9        The Court finds that Yvonne's speech is not constitutionally a matter of public

10  concern, and therefore not protected by the First Amendment.  While Yvonne's claims may state

11  a cause of action, it is not appropriately brought as a First Amendment action.  Therefore, Royal's

12  motion to dismiss is GRANTED.

13              **d.  William's First Amendment Retaliation Claim Against Royal**

14       William claims that Royal retaliated against him for exercising his First

15  Amendment rights when Internal Affairs opened an investigation against William for disclosing

16  information about the Truckee theft at Yvonne's Skelly hearing.  (ECF No. 12 at ¶ 49.2.)

17  William further alleges that he was placed on administrative leave pending evaluation of his

18  fitness for duty in retaliation.  (ECF No. 12 at ¶ 49.2.)  Royal has moved to dismiss this claim on

19  the grounds that William's speech was not protected by the First Amendment or, in the

20  alternative, that Royal is entitled to qualified immunity.  (ECF No. 14-1 at 10–12, 13–14.)  The

21  Court finds William's speech was also unprotected, but also finds that, even had the speech been

22  protected, Royal is entitled to qualified immunity.

23       William's speech is subject to the same test as applied to Yvonne's First

24  Amendment claim:  whether the speech was: (1) made as a public or private citizen; (2) of public

25  interest; and (3) undermined the efficiency of the workplace in a way that would justify treating

26  the employee differently from any other member of the general public.  *Ceballos*, 547 U.S. at

27  418.  As Plaintiffs correctly point out, the content of William's speech dealt with internal theft,

28  which could be of interest to the public in evaluating the workings of their government.  (*See* ECF

No. 15 at 14–15); *see also* Gibson, 561 F.3d at 926.  However, Plaintiffs also correctly state that

William was attempting to use this information to assist his wife at her Skelly hearing, not to alert

the public about mismanagement or corruption.  (*See* ECF No. 15 at 13); *cf. McKinley*, 705 F.2d

at 1115 (relying in part on plaintiff's speech being purposefully directed at the public through city

council meetings and a television interview to find it a matter of public concern).  As the form

and context of William's speech were not directed toward the public, the Court finds that

William's speech is not a matter of public concern and therefore is not protected.

Further, even if the Court were to find that William's speech is protected, Royal is

entitled to qualified immunity.  "Qualified immunity balances . . . the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v.*

*Callahan*, 555 U.S. 223, 231 (2009).  The doctrine of qualified immunity insulates government

officials from civil damages in § 1983 litigation "insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Pearson*, 555 U.S. at 231 (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified

immunity is an affirmative defense; the burden of pleading it rests with the defendant.  *Crawford–*

*El v. Britton*, 523 U.S. 574, 586–87 (1998) (*citing Gomez v. Toledo*, 446 U.S. 635, 639–41

(1980)).  Furthermore, because qualified immunity is "an immunity from suit rather than a mere

defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial."

*Pearson*, 555 U.S. at 231 (*citing Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Accordingly,

the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the

earliest possible stage in litigation.  *Id.* at 233–34 ("Because qualified immunity protects

government officials from suit as well as from liability, it is essential that qualified immunity

claims be resolved at the earliest possible stage of litigation.") (*citing Forsyth*, 472 U.S. at 526).

The determination of qualified immunity requires a two-step test: (1) whether

facts alleged, taken in the light most favorable to the injured party, show the defendants' conduct

violated a constitutional right; and (2) whether the right was clearly established.  *Lacey v.*

*Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc). The first prong of the qualified

1   immunity analysis is distinct from the inquiry on the merits of the constitutional violation.

2   *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Forsyth*, 472 U.S. at 527–28 (1985) ("A claim

3   of immunity is conceptually distinct from the merits of the Plaintiff's claim that his rights have

4   been violated.").  The inquiry into whether certain speech by public employees is fact-specific

5   and sufficiently unclear that Royal could reasonably believe he was lawfully able to restrict

6   William's speech in this matter.  *Fitzgerald*, 457 U.S. at 818–19.  While a sheriff clearly cannot

7   retaliate against an employee who exercises his constitutionally-protected right to freedom of

8   expression, the law surrounding whether William's speech is protected is sufficiently unsettled.

9   Therefore, Royal would not have been put on notice as to whether William's speech was

10   protected.  The Court thus GRANTS Royal's motion to dismiss William's First Amendment

11   retaliation claim.

12   **e.  Yvonne's Fourth Amendment Claim Against Royal**

13   Yvonne claims Royal violated her Fourth Amendment right to be free from

14   unreasonable seizure when Yvonne was charged with mishandling County funds and booked.

15   (ECF No. 12 at ¶ 66.)  Royal moved to dismiss, arguing that Yvonne's claim is barred by the

16   statute of limitations and that Royal is entitled to qualified immunity.  The Court will address

17   each of these arguments in turn.

18   **i.  Statute of Limitations**

19   Defendants contend that Yvonne's Fourth Amendment claim is time-barred.  (ECF

20   No. 14-1 at 5.)  Defendants argue that California's two-year statute of limitations on § 1983

21   claims begins to run as soon as a plaintiff is aware of the injury that forms the basis of the cause

22   of action.  (ECF No. 14-1 at 5); *see also Cabrera v. City of Huntington Park*, 159 F.3d 374, 379–

23   80 (9th Cir. 1997).  As Yvonne is claiming unreasonable seizure, Defendants argue that the claim

24   accrued when Yvonne was first arraigned on August 8, 2011, more than two years before the

25   original complaint was filed.  (ECF No. 14-1 at 6.)  Defendants argue that the addition of a

26   judicial order that Yvonne be booked later adds an extra restriction on Yvonne original seizure,

27   the arraignment.  (ECF No. 14-1 at 6.)

28   The Court does not find this argument convincing.   Defendants cite *Karam v. City*

14

*of Burbank*, 352 F.3d 1188 (9th Cir. 2003).  (ECF No. 14-1 at 6–7.)  However, Defendants'

reliance on this case is misplaced.  *Karam* held that a plaintiff was not seized when she was

released on pre-trial conditions that required her to appear in court for hearings.  *Id.* at 1193–95.

In fact, *Karam* stated: "[i]n this circuit we have held, not surprisingly, that a Fourth Amendment

seizure occurs when a person is held in custody by arresting officers."  *Id*; *see also Fontana v.*

*Haskin*, 262 F.3d 871, 879 (9th Cir. 2001) ("[I]nitial arrests plainly constituted seizures for Fourth

Amendment purposes.  These seizures continued while the [detainees] were en route to the

sheriff's department in the custody of the arresting officers.") (internal quotations and citations

omitted).  Yvonne was not remanded over into custody and booked immediately, but instead was

booked on August 24, 2011.  (ECF No. 15 at 7.)  On August 8, Yvonne had no way of knowing

whether she would actually be seized, or if some other event may have intervened.  The Court

finds that Yvonne was seized on August 24, 2011, when she was booked.  The original complaint

was filed August 24, 2013, two years after she was booked.  (ECF No. 1.)  Therefore, Yvonne's

complaint was timely filed, and Defendants' motion to dismiss Yvonne's Fourth Amendment

claim as time-barred is DENIED.

### ii.    Yvonne's Probable Cause Argument

Yvonne alleges she was arrested and charged without probable cause, and that

Royal knew there was no probable cause to charge her because the applicable statute of

limitations had run.  (ECF No. 12 at ¶ 66.)  The standard of probable cause is a reasonable ground

for belief of guilt, particularized to the person to be seized or searched.  *Maryland v. Pringle*, 540

U.S. 366, 371 (2003).

Yvonne points to a number of reasons why she believes there was no probable

cause to suspect her.  She claims that Cantrell, her ex-husband, is an unreliable source of

information and was clearly making a report to be vindictive.  (ECF No. 15 at 11.)  She points to

the missing bail money from Truckee.  (ECF No. 15 at 11.)  She claims she passed a polygraph

test, although she refused a voice stress analysis test.  (ECF No. 15 at 12.)  She also points to the

fact that some of the missing $13,000 disappeared while she was on sick leave and that several

other employees in the office had access to the funds and financial issues.  (ECF No. 15 at 12–

15

13.)  Finally, she points to the expired statute of limitations as a bar to finding probable cause. (ECF No. 15 at 12.)

The Court is not swayed by this recitation of facts.  Probable cause does not require absolute proof, only enough facts that a reasonable person could suspect a particular individual had committed a crime.  *Pringle*, 540 U.S. at 371.  Here, the Court finds Royal had probable cause to suspect Yvonne had stolen money from the County.  Cantrell, despite being previously married to Yvonne, would not appear to have any reason to know there was actually money missing from Yvonne's department.  (*See* ECF No. 12 at ¶¶ 22, 24.)  A reasonable person could conclude that the reason Cantrell knew the money was missing was because Yvonne had stolen it.  In addition, during her initial interrogation, Yvonne first claimed that she did not take money home, then corrected her story and said that she had done so once because she forgot to deposit funds, but deposited them the next day.  (ECF No. 12 at ¶ 24.)  Assuming Yvonne was telling the truth, a reasonable officer could see her statement as evasive and believe she was hiding something.  Finally, Yvonne claims that, when she was shown specific receipts, she was able to explain or disprove all but one of them.  (ECF No. 12 at ¶ 41.)  This means that Yvonne could not explain at least one suspicious receipt.  Taken together, there is enough to find probable cause that Yvonne mishandled funds.

Yvonne's argument that the expired statute of limitations nullifies probable cause is also unconvincing.  The Ninth Circuit has not ruled on this specific matter, but the Third Circuit has, and this Court finds their reasoning convincing.  In *Sands v. McCormick*, 502 F.3d 263 (3rd Cir. 2007), the court found that the statute of limitations is not a factor in determining probable cause.  *Id.* at 269.  "The statute of limitations is an affirmative defense that is to be ruled upon by a court of competent jurisdiction."  *Id.*  The Third Circuit held that, because "the application of the limitations period is not a clear cut matter in criminal prosecutions," requiring police officers to know the intricacies of statutes of limitation was too great a burden.  *Id.* at 269–70.  This Court finds the Third Circuit's reasoning persuasive, and thus we apply it here.  Although the Ninth Circuit has not spoken on this matter, the Court notes that a district court in Washington has also applied *Sands* to a similar matter, and reached the same conclusion.  *Kitch v.*

16

1   *City of Kirkland*, No. C11-823RAJ, 2012 WL 924345, at *9 (W.D. Wash. Mar. 19, 2012).

2              Moreover, even if no probable cause existed to arrest Yvonne for mishandling

3   County funds, this Court finds that Royal is entitled to qualified immunity.  Qualified immunity

4   attaches when an officer acts in an objectively reasonable manner even if a court later finds lack

5   of probable cause.  *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987).  Accordingly, Royal's

6   motion to dismiss Yvonne's Fourth Amendment claim is GRANTED.

7          **V.        CONCLUSION**

8              For the foregoing reasons, Defendants' Motion to Dismiss Plaintiff's FAC (ECF

9   No. 14) is DENIED IN PART and GRANTED IN PART.  The Court orders the following:

10             •   County's Motion to Dismiss Plaintiffs' First and Fourth Amendment

11                 claims is GRANTED.  Plaintiffs are granted leave to amend as to these

12                 claims.  Should Plaintiffs choose to file an amended complaint, they must

13                 file such within thirty (30) days from the entry of this order;

14             •   Defendants' Motion to Dismiss Yvonne's Fourth Amendment claim as

15                 time-barred is DENIED;

16             •   Royal's Motion to Dismiss Plaintiffs' First Amendment claims is

17                 GRANTED;

18             •   Royal's Motion to Dismiss Yvonne's Fourth Amendment claim is

19                 GRANTED.

20   Dated:  December 5, 2014

21

22

23                                              Troy L. Nunley
                                                United States District Judge
24

25

26

27

28